2016 IL App (1st) 143487

FOURTH DIVISION
December 22, 2016

No. 1-14-3487

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS *ex rel*. LISA MADIGAN, Attorney General of the State of Illinois, | ) ) ) |
| Plaintiff-Appellant, | ) ) ) |
| v. | ) Appeal from ) the Circuit Court |
| LINCOLN, LTD., an Illinois Corporation; JOHN EINODER; LAND OF LINCOLN DEVELOPMENT COMPANY, an Illinois Corporation; DONALD P. CLARKE; LESLIE E. CLARKE; and VINCENT CAINKAR, | ) of Cook County ) ) 04-CH-12782 ) ) Honorable |
| Defendants, | ) David B. Atkins, ) Judge Presiding ) |
| (Land Of Lincoln Development Company, Donald P. Clarke, Leslie E. Clarke, and Vincent Cainkar, Defendants-Appellees; The Village of Ford Heights, an Illinois Municipal Corporation, Intervenor-Defendant). | ) ) ) ) |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Howse concurred in the judgment and opinion.
Presiding Justice Ellis concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    The parties have been litigating for 12 years about a 40-acre landfill that operated in Ford Heights, Illinois, between 2002 and 2007 without a waste disposal permit from the Illinois Environmental Protection Agency (IEPA or agency) and accumulated a mound of debris that is at least 70 feet tall, 1780 feet long, and 800 feet wide. Settled rulings have established that the landfill materials are the type that required a permit and that the operators of the now-shuttered site, who were leasing the land, are liable for remediation and fines to be determined after this second interlocutory appeal. The argument now presented on appeal by the People of the State of Illinois *ex rel.* Lisa Madigan, Attorney General of the State of Illinois, on behalf of IEPA, is that

liability should be extended to the owners of the property and to an individual officer of the owner corporation. The primary landowner is Land of Lincoln Development Corporation (LOLDC). The individual officer is Vincent Cainkar. The People contend that once the landowner was notified by IEPA that the agency believed the landfill needed a permit, the landowner should have obtained a permit itself or forced the facility owner-operator to either get a permit or stop operating and that the landowner's failure to act means it "allowed" open dumping in violation of sections 21(a) and 21(p) of the Environmental Protection Act (Act) (415 ILCS 5/21(a), (p) (West 2002)). The People also contend that because the material has not yet been removed, the landowner has "store[d] or abandon[ed]" waste at an unpermitted landfill in violation of section 21(e) of the Act. 415 ILCS 5/21(e) (West 2002). The People's argument for holding Mr. Cainkar personally liable is that he was either a "responsible corporate officer" of LOLDC, an active participant in the statutory violations, or the "alter ego" of LOLDC. LOLDC and Mr. Cainkar respond that the record indicates LOLDC did not operate, control, or have the capacity to control the landfill operations and that there is no factual basis for taking the extraordinary step of holding the corporation's individual officer personally liable.

¶ 2     The Ford Heights property is located south of the City of Chicago, east of Bishop Ford Expressway and north of Lincoln Highway, at or near 2061 East 14th Street. It was and is owned by Leslie E. Clarke, her husband Donald P. Clarke, and LOLDC, which is an Illinois corporation whose shareholders and officers are the Mr. and Mrs. Clarke, Cathy Cainkar, and Cathy's husband, attorney Vincent Cainkar. Mr. Clarke and Mr. Cainkar are cousins. For simplicity, we are referring to the individual corporate officer as Mr. Cainkar and to the corporate and individual property owners collectively as either LOLDC or the landowner. The landfill operations began pursuant to an agreement between Lincoln, Ltd., LOLDC, and the Village of

Ford Heights.

¶ 3    In a written royalty agreement executed in November 2001, LOLDC's corporate predecessor agreed to give access to its property to the corporate predecessor of Lincoln, Ltd., as the developer of, among other things, a "clean construction or demolition debris landfill." The agreement indicated the developer, which we will refer to as Lincoln, had "the financial resources and technical expertise to engineer, develop, and operate" the proposed facility and would "provide services and sufficient capital to develop the proposed facility." Lincoln also expressly "agree[d] to develop and operate the Facility in compliance with all federal, state and local laws and regulations, and current practices and technology, including conforming with the requirements of the Illinois Environmental Protection Act and the Surface-Mined Land Conservation and Reclamation Act," and to obtain any required permits. The contract also stated it was "expressly agreed to by the parties that nothing contained herein shall be construed to make the parties hereto partners or joint venturers, nor shall either party be entitled to bind the other in any manner by its actions." Under the contract, Lincoln became obligated to "indemnify, defend and hold Owner harmless from and against all suits, causes of action, claims, damages, judgments, penalties, demands, injunctions, costs, disbursements or expenses (including reasonable attorney's fees) of any kind" whether they be "imposed upon, incurred by or asserted or awarded against the Owner" due to "the ownership or operation of the Facility by the Developer or the release of any substances in violation of any environmental law." Disputes were to be handled through mediation, or, as a last resort, binding arbitration. LOLDC was to receive 27% of Lincoln's gross revenues from disposal at the site and other income.

¶ 4    The November 2001 version of the parties' contract misstated Mr. Cainkar's title as corporate president and Mrs. Clarke's title as corporate secretary. One of the People's arguments

for holding Mr. Cainkar personally liable is that he "sometimes signed corporate documents using titles held by other people." However, the 2001 contract was not performed on and was superseded by a "Royalty Agreement" between LOLDC and Lincoln dated July 1, 2002, which was executed by Mrs. Clarke with her correct title of president of LOLDC. The plan was for Lincoln to operate its landfill on LOLDC's land for up to 20 years and then cover the accumulated debris to form a ski hill and outdoor recreation facility.

¶ 5    Operations began in mid-2002, and within two months, IEPA was inspecting the site. It is undisputed that the material discarded on the property is categorized mostly as "clean construction or demolition debris" within the meaning of the Act and consists of broken brick, concrete, and cinder blocks, and soil, sand, and clay generated from construction or demolition activities. See 415 ILCS 5/3.160, 3.535, 3.385 (West 2002) (defining "waste" and "refuse"). The Act defines "clean construction or demolition debris" as "uncontaminated broken concrete without protruding metal bars, bricks, rock, stone, reclaimed asphalt pavement, or soil generated from construction or demolition activities." 415 ILCS 5/3.160(b) (West 2002). The Act defines "refuse" as "waste" (415 ILCS 5/3.385 (West 2010)) and specifies that "waste" includes "any garbage *** or other discarded material." 415 ILCS 5/3.535 (West 2002). This statute does not define "litter," but the Litter Control Act defines it as "any discarded, used or unconsumed substance or waste. 'Litter' may include, but is not limited to, any garbage, trash, refuse, debris, rubbish *** or anything else of an unsightly or unsanitary nature, which has been discarded, abandoned or otherwise disposed of improperly." 415 ILCS 105/3(a) (West 2002).

¶ 6    Title V of the Act addresses refuse disposal and land pollution. 415 ILCS 5/20 *et seq.* (West 2002). Section 21 of Title V lists various prohibited acts. 415 ILCS 5/21 (West 2002). Subsection 21(e) (415 ILCS 5/21(e) (West 2002)) prohibits as follows:

"No person shall:

* * *

e. Dispose, treat, store or abandon any waste, or transport any waste, or transport any waste into this State for disposal, treatment, storage or abandonment, except at a site or facility which meets the requirements of this Act and of regulations and standards thereunder."

¶ 7    Together, subsections 21(a) and 21(p) (415 ILCS 5/21(a), 21(p) (West 2002)) provide:

"No person shall:

(a) Cause or allow the open dumping of any waste.

* * *

(p) In violation of subdivision (a) of this Section, cause or allow the open dumping of any waste in a manner which results in any of the following occurrences at the dump site:

(1) litter;

* * *

(7) deposition of

***

(ii) clean construction or demolition debris[.]" 415 ILCS 5/21 (West 2002).

¶ 8    Under the Act, the term "person" includes individuals, corporations, and other entities not relevant here. 415 ILCS 5/3.315 (West 2002). The Act defines "open dumping" as "the consolidation of refuse from one or more sources at a disposal site that does not fulfill the requirements of a sanitary landfill." 415 ILCS 5/3.305 (West 2002).

¶ 9    In a letter dated October 3, 2002, IEPA informed LOLDC that the agency deemed the landfill operation to be in violation of environmental statutes, regulations, or permits. The letter offered "SUGGESTED RESOLUTIONS," such as obtaining an "NPDES" wastewater discharge permit, ceasing all open dumping, and removing all the landfill material within one month. Counsel purporting to represent Lincoln, LOLDC, and Mr. Cainkar responded on November 18, 2002, that the material being accepted at the site was not "waste" as that term was used in the statute requiring a disposal permit, and counsel emphasized that the operation was part of an economic development plan that had been zoned and licensed by the Village of Ford Heights and that it was generating tax revenues for the municipality and eventually jobs at the planned outdoor recreation facility. Mr. Cainkar would subsequently testify, however, that at no time did Lincoln's attorney also represent LOLDC and Mr. Cainkar. In any event, the agency responded on January 22, 2003, that counsel's letter "fails to adequately address the violations listed" and that if they could not reach an agreement, IEPA might refer the matter for enforcement proceedings.

¶ 10    In February 2003, Mr. Cainkar lobbied for a legislative amendment that would specifically exclude "clean construction and demolition debris" from the definition of "waste" if the material was "used to construct a recreation facility at a site located within an Enterprise Zone, as certified by the Department of Commerce and Community Affairs, pursuant to a permit issued by a municipality with an equalized assessed valuation of less than $15,000,000." It is undisputed that the seemingly general language referred only to the Ford Heights landfill. The People cite Mr. Cainkar's lobbying as an indication that he chose to "allow" open dumping to continue. Mr. Cainkar subsequently wrote a letter to counsel, advising that the IEPA was opposing the proposed legislation by arguing that the owner of Lincoln, John Einoder, was

"unscrupulous, among other things." Mr. Cainkar's lobbying was unsuccessful.

¶ 11    In June 2003, IEPA again notified LOLDC of the possibility of legal action and that LOLDC could meet with IEPA to attempt to resolve the agency's concerns. One of the agency's concerns was that there was no NPDES permit for the discharge of water from a retention pond to a ditch along the east side of the property. Lincoln had applied for the NPDES permit, and in September 2003, Mr. Cainkar reminded Mr. Einoder by letter that he had failed to follow through on his application, which was in breach of his contractual obligation to develop and operate the facility in compliance with environmental law. Mr. Einoder subsequently obtained the permit.

¶ 12    IEPA referred its "waste" findings to the Attorney General for enforcement, and on August 6, 2004, which was nearly two years after IEPA had inspected and offered "SUGGESTED RESOLUTIONS," the People filed a complaint for injunctive relief and civil penalties against Lincoln, Mr. Einoder, and LOLDC.

¶ 13    Within 10 days, LOLDC served Lincoln with notice of default of their royalty agreement and demanded that Lincoln immediately cease operating. Lincoln, however, maintained that its operations were not violating any environmental law, and it refused to shut down. Ten days later, LOLDC repeated the notice, but Lincoln again ignored the property owner's demand. On September 24, 2004, when the People filed a motion for preliminary injunction, LOLDC joined in the People's motion to close the facility and demanded that Lincoln reimburse LOLDC in accordance with the indemnification clause in their royalty agreement. However, in a letter dated October 5, 2004, Lincoln countered that "any agreement [LOLDC reaches] with the State of Illinois to deny Lincoln, Ltd. the access to which it is entitled by contract amounts to a breach of that contract and would entitle Lincoln, Ltd. to damages for the loss of net income from the

project and further entitle Lincoln, Ltd. to suspend performance of its obligations [including the indemnification clause] until the breach is cured." A series of hostile letters were then exchanged between LOLDC and Lincoln during October, but LOLDC persistently maintained "we have not and will not sit idly by while [Lincoln acts illegally]" and that none of the royalty agreement provisions "could conceivably be interpreted as requiring the property owners to accede to or cooperate with illegal activities." LOLDC also made clear that it would continue to join in and cooperate with "the State's effort to enjoin [Lincoln's] *** illegal operations." The People, however, failed to obtain a hearing date for their motion to close the facility, and Lincoln continued to operate. Lincoln also rejected LOLDC's indemnification demand (unless LOLDC tendered its defense to Lincoln), at which point LOLDC demanded arbitration in accordance with the royalty agreement. Lincoln, however, also rebuffed LOLDC's demand to arbitrate. LOLDC then filed a motion within the circuit court proceedings for an order compelling Lincoln to arbitrate, and the court granted the order. In the arbitration proceedings, LOLDC again contended Lincoln's operations were illegal and that Lincoln should be ordered to shut down. Lincoln, nonetheless, continued operating. Lincoln took a similar obstructionist tack with respect to the People's action and contended substantial discovery was necessary before the dispute could proceed to hearing. It is unclear from the record and briefs on appeal how the People responded, but according to LOLDC, the People simply allowed their case to "languish for over three years," and the People have not disagreed with LOLDC's recitation of the facts.

¶ 14     In 2007, the People proceeded by moving for partial summary judgment as to whether the accumulated debris was "waste," and the trial court granted the People's motion. Lincoln appealed in 2007. The Village of Ford Heights was a proponent of Lincoln's landfill operation, and it sought and received leave to intervene in the appeal as Lincoln's co-appellant. Lincoln

asked the circuit court for a stay of execution pending the appeal. Lincoln was unwilling or unable to put up an appeal bond, and the circuit court denied the stay. Lincoln then agreed to close the site effective December 12, 2007, without prejudice, provided it could reopen the site if its appeal was successful. The appeal was not successful (*People ex rel. Madigan v. Lincoln, Ltd.*, 383 Ill. App. 3d 198, 200, 890 N.E.2d 975, 976 (2008)), and the site has remained closed.

¶ 15 After Lincoln and Ford Heights' interlocutory appeal failed, the People sought a permanent injunction that would require, among other things, that Lincoln move all the landfill material to a permitted facility. Several more years passed as the parties prepared for trial on the injunction request by negotiating stipulations and engaging in motion practice. One of the motions, for instance, concerned whether LOLDC could suspend its efforts to arbitrate with Lincoln and instead proceed against Lincoln in court, given that their designated arbitrator had ceased doing business and that the royalty agreement did not provide for the appointment of a successor arbitrator. In 2009, the court vacated its order to arbitrate and granted LOLDC leave to proceed with litigation. That same day, LOLDC filed its counterclaim against Lincoln, seeking, among other things, groundwater monitoring, remediation of its property, indemnification of its various expenses stemming from the unpermitted landfill, an accounting, and approximately $100,000 in unpaid royalties. This was opposed by a motion to dismiss, then an answer which included affirmative defenses. LOLDC's motion to strike Lincoln's affirmative defenses was granted. By agreed injunctive order which the People, Lincoln, and LOLDC entered into in 2009, LOLDC went to the expense of hiring an environmental consultant who drilled and tested the groundwater for four quarters, and this effort confirmed that there was no contamination coming from the former site of Lincoln's operations.

¶ 16 Another dispute was whether the 2007 partial summary judgment imposed liability on

LOLDC for the waste Lincoln had accumulated on LOLDC's land. The judge who entered the 2007 order was no longer presiding over the case. In 2011, the judge then presiding ruled that LOLDC's liability had not yet been determined. At this point, the People filed an amended complaint to revise and add claims against LOLDC.[1] In 2012, the court granted LOLDC's motion for partial summary judgment against Lincoln as to its indemnification claim and specified "pursuant to the Royalty Agreement, [LOLDC] had no role in the operation or development in the landfill in question" and "LOLDC did not allow Lincoln to operate illegally." The court concluded, "Lincoln, Ltd. is obligated to indemnify LOLDC for the underlying environmental violations and for reasonable attorney's fees, costs, and expenses of this litigation."

¶ 17     Effective July 23, 2012, the Illinois legislature banned the establishment or permitting of any "new municipal solid waste landfill unit or a new sanitary landfill in a county of more than

---

[1] The first nine counts of the People's amended complaint were directed at Lincoln and Mr. Einoder and are not at issue here. The latter nine counts were directed at LOLDC, the Clarkes, and Mr. Cainkar, and are summarized as follows. In counts X and XI, the People claimed that by not obtaining their own permit or requiring Lincoln to obtain a permit before accepting waste at the landfill, the landowners violated section 21(a) (415 ILCS 5/21(a) (West 2002)), by causing or allowing the open dumping of clean construction or demolition debris. In count XII, the People claimed that once Lincoln stopped operating the illegal landfill in 2007, the landowners became the operators, which was contrary to section 21(d) (415 ILCS 5/21(d) (West 2002)). Count XIII was also premised on section 21(d) and also alleged that the landowners developed or operated an unpermitted landfill. 415 ILCS 5/21(d) (West 2002). Count XIV was based on section 21(e), which prohibits the disposal, treatment, storage, or abandonment of waste at an unpermitted facility. 415 ILCS 5/21(e) (West 2002). Count XV depicted the landowners as having caused or allowed litter, contrary to section 21(p). 415 ILCS 5/21(p) (West 2002). Count XVI indicated the owners of a waste disposal operation had failed to post bond for a waste storage, waste treatment, or waste disposal operation as required by section 21(d). 415 ILCS 5/21(d) (West 2002). Section 21(o) prohibits the operation of a sanitary landfill without a permit and was the focus of count XVII. 415 ILCS 5/21(o) (West 2002). Count XVIII alleged the owners or operators of the sanitary landfill failed to timely submit reports and pay fees for the disposal of waste, in violation of section 22.15(a). 415 ILCS 5/22.15(a) (West 2002). The People sought injunctive relief including groundwater monitoring and remedial work as needed, waste removal, and civil penalties, costs, and attorney fees.

2,000,000 inhabitants." 415 ILCS 5/22.43a (West 2014). This wording encompasses Cook County and thus Ford Heights, Illinois, and the unpermitted landfill at issue.

¶ 18    Between late 2012 and early 2014, LOLDC and the People filed cross-motions for partial summary judgment as to the People's amended complaint. The trial court resolved these motions in LOLDC's favor in 2014. When LOLDC filed a subsequent motion for partial summary judgment as to the remaining counts of the People's amended complaint, the court ruled that its previous reasoning was dispositive, and it granted LOLDC's motion. The court clarified that its summary judgment rulings encompassed the Clarkes even though they were not identified by name in the prior rulings. The People asked for reconsideration, but the motion was denied. After that, the court entered an order specifying that there was no reason to delay either enforcement or appeal of its summary judgment rulings as to LOLDC and the People. This interlocutory appeal by the People pursuant to Supreme Court Rule 304(a) followed. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010).

¶ 19    We first address LOLDC's contention that the People concede the appeal by limiting the appellate arguments to only three of the nine counts that were addressed by the summary judgment rulings. LOLDC argues that all nine counts are "inextricably intertwined, and flow from the identical factual basis," and that by appealing as to only counts X, XIV, and XV, the People concede the correctness of the other counts and thus concede the entire appeal. LOLDC cites the general principle that arguments not raised in an opening brief are waived and shall not be addressed in the appellant's reply brief or a petition for rehearing. *Interstate Bank of Oak Forest v. Sluis*, 79 Ill. App. 3d 1039, 1045, 398 N.E.2d 1015, 1018 (1979); Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

¶ 20    We do not find LOLDC's "all or nothing" argument persuasive. It is circular reasoning,

and it is not supported by the cited authority. *Sluis*, 79 Ill. App. 3d at 1045, 398 N.E.2d at 1018 (court found that certain arguments were waived by inadequate briefing, but court addressed remaining argument). The People were under no obligation to maintain all their claims on appeal, even if all nine counts were based on one set of common facts. The claims are not dependent upon each other, and the People were free to abandon theories and limit their focus to the claims and arguments they considered most persuasive and likely to succeed. The People did not concede their appeal by concentrating their efforts on three of the nine theories they presented in the trial court. Their arguments, and thus our consideration, concern three counts and are not affected by the status of the other six counts. We will address the merits of the parties' appellate arguments as to counts X, XIV, and XV of the amended complaint.

¶ 21 The policy underlying summary judgment proceedings is to streamline litigation, avoid unnecessary trials, and reduce congestion on the court's calendar. *Lincoln*, 383 Ill. App. 3d at 204, 890 N.E.2d at 980. Thus, when the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law, the entry of summary judgment is appropriate. *Lincoln*, 383 Ill. App. 3d at 204, 890 N.E.2d at 980. In a summary judgment proceeding, the court does not decide factual issues and instead determines whether any exist. *Lincoln*, 383 Ill. App. 3d at 204, 890 N.E.2d at 980. If reasonable persons could disagree about the material facts or diverge on the inferences fairly drawn from those facts, then the court must deny the motion and resolve the facts and inferences at trial. *Montes v. Hawkins*, 126 Ill. App. 3d 419, 423, 466 N.E.2d 1271, 1274 (1984). Summary judgment should be granted only when the right of the moving party is clear and free from doubt. *Lincoln*, 383 Ill. App. 3d at 204, 890 N.E.2d at 980. An appellate court addresses the issues

*de novo*, without any deference to the trial court's findings. *Lincoln*, 383 Ill. App. 3d at 204, 890 N.E.2d at 980.

¶ 22    The Illinois legislature enacted the Act to establish a unified, statewide program to restore, protect, and enhance the quality of the environment in Illinois. 415 ILCS 5/2(b) (West 2002). The Act is to be liberally construed to effect its purposes. 415 ILCS 5/2(c) (West 2002); *People ex rel. Ryan v. McFalls*, 313 Ill. App. 3d 223, 226, 728 N.E.2d 1152, 1154 (2000). The General Assembly specified that a primary purpose of the Act is to assure that "adverse effects upon the environment are fully considered and borne by those who cause them." 415 ILCS 5/2(b) (West 2002).

¶ 23    As we indicated, the People argued for summary judgment on grounds that LOLDC "allowed" open dumping within the meaning of the Act, and on appeal, this argument is limited to counts X and XV. This argument is about the sufficiency of LOLDC's actions to prevent Lincoln from operating the landfill illegally. The People contend the property owner is liable for allowing open dumping given its "capacity to control" the premises and prevent pollution on its land. They contend the individual property owners were familiar with the Act and had experience in waste disposal matters, given that in 1990, they applied for and received a permit from IEPA to own, develop, and operate a 30-acre landscape waste composting facility on the land at issue and that it did not begin operating that composting business until after receiving the permit. The People contend LOLDC nonetheless chose to let its Ford Heights property be used as a landfill, authorized a prohibited use by agreeing to let Lincoln accumulate debris above ground level, and entered into the July 2002 royalty agreement with Lincoln's principal, Mr. Einoder, despite knowing that he was a defendant in a civil enforcement proceeding. They support this contention with Mr. Cainkar's statements at a deposition in 2007:

"Q. Did you have an understanding that a permit was required by the Illinois Environmental Protection Agency?

A. I don't think I'm really—I mean, I'm not an environmental lawyer. I don't know that I could tell you what—what is or what is not required because that's a changing field of law.

Q. Okay. So you had no idea at all whether Mr. Einoder or Lincoln, Ltd., was required to get a permit from the IEPA in order to do the business that's outlined in the royalty agreement?

A. That is correct. I understood it was their responsibility, and if they needed it, they had to get it.

Q. Do you know if any types of permits were ever given to Lincoln, Ltd., or to Mr. Einoder from the IEPA?

A. I have—I don't know.

Q. Were you aware, at the time that the royalty agreement was signed, that Mr. Einoder was involved in any litigation with the Illinois Environmental Protection Agency?

A. I was—

Q. I would say Mr. Einoder and [his corporation]?

A. I was aware that Mr. Einoder was involved in some litigation involving another facility located east of us. I don't know who the litigation was with.

Q. You don't know the subject of the litigation?

A. No."

The People also cite a letter written in late 2002 indicating that IEPA violation notices had been

sent to Mr. Einoder regarding his other waste site in Lynwood, Illinois, and that he was disputing whether the statutory definitions of "waste" and "grade" were sufficiently clear and definite to prohibit the way he was using that other property. The People argue that LOLDC was aware that a permit was necessary, as demonstrated by the violation notices that LOLDC received from IEPA and Mr. Cainkar's lobbying for a legislative change. LOLDC, however, failed to ensure that Lincoln obtain a permit and did not require Lincoln to shut down until after the People filed suit. Thus, LOLDC "ignored warning signs and condoned continued dumping," which leads the People to conclude that LOLDC "allowed" open dumping of the clean general construction or demolition debris within the meaning of sections 21(a) and (p) of the Act. 415 ILCS 5/21(a), (p) (West 2002).

¶ 24    We are not persuaded by the People's argument. The argument is flawed in part because it is irrelevant whether some of the individual property owners were familiar with the Act or had prior experience with the permitting process, because knowledge, awareness, or intent are not elements of a violation of section 21(a) and (p) of the Act. See *Phillips Petroleum Co. v. Pollution Control Board*, 72 Ill. App. 3d 217, 220, 390 N.E.2d 620, 623 (1979). Liability is found when IEPA shows the alleged polluter had the capability of controlling the pollution or at least had control of the premises where the pollution occurred. *Phillips Petroleum*, 72 Ill. App. 3d at 220, 390 N.E.2d at 623.

¶ 25    A case illustrating the "capacity to control" is *Phillips Petroleum*, in which IEPA filed an administrative action against the owner of a train tank car that derailed in Glen Ellyn, Illinois, and released a tankerful of noxious gas, which caused personal injuries and property damage. *Phillips Petroleum*, 72 Ill. App. 3d at 218, 390 N.E.2d at 622. The owner had entrusted its property into the hands of a railroad company for delivery to a consignee in Wisconsin. *Phillips*

*Petroleum*, 72 Ill. App. 3d at 220, 390 N.E.2d at 623. The Illinois Pollution Control Board ruled that the owner was liable for the emission of its gas, but on appeal, the court found that at the time the derailment occurred, the tank owner was not in "sufficient control over the source of the pollution" for liability to attach. *Phillips Petroleum*, 72 Ill. App. 3d at 220-21, 390 N.E.2d at 623. Consistent with this holding is *Meadowlark*, which involved water pollution that took place when rain seeped through mine refuse piles, creating acidic runoff, in violation of section 12(a) of the Act. *Meadowlark Farms, Inc. v. Pollution Control Board*, 17 Ill. App. 3d 851, 854, 308 N.E.2d 829, 831 (1974). The court emphasized that the respondent company owned the refuse piles, which had accumulated for many years, that the rain seepage from the piles killed fish, and that the company "had the capability of controlling the pollutional discharge." *Meadowlark*, 17 Ill. App. 3d at 861, 308 N.E.2d at 836.

¶ 26 The standard requiring a defendant to have exercised sufficient control over the source of the pollution is repeated in various cases the People now cite as reason to hold LOLDC liable for the landfill materials that were improperly discarded on its property. See *People v. Fiorini*, 143 Ill. 2d 318, 346, 574 N.E.2d 612, 623 (1991) ("The analysis applied by courts in Illinois for determining whether an alleged polluter has violated the Act is whether the alleged polluter exercised sufficient control over the source of the pollution."); *People v. Brockman*, 143 Ill. 2d 351, 373, 574 N.E.2d 626, 635 (1991) (citing authority from various jurisdictions for the proposition that there is an "oft-stated rule that liability for the pollution requires that the defendant be in control of the pollution"); *People v. A.J. Davinroy Contractors*, 249 Ill. App. 3d 788, 793, 618 N.E.2d 1282, 1286 (1993) ("The State must show that the alleged polluter has the capability of control over the pollution or that the alleged polluter was in control of the premises where the pollution occurred."); *Gonzalez v. Pollution Control Board*, 2011 IL App (1st)

093021, ¶ 33, 960 N.E.2d 772 (citing *A.J. Davinroy*, 249 Ill. App. 3d at 793).

¶ 27    However, none of the cases the People cite provide reasoning to hold a property owner liable for environmental violations committed by or under the watch of a separate facility operator. The first case, *Fiorini*, involved property owners who were operating a waste dump on their own property just west of Ottawa, Illinois, which became the subject of an IEPA enforcement action, and the issue was whether those owner-operators could maintain an action against third parties who were alleged to have improperly generated, transported, or otherwise arranged for the dumping of demolition debris on the property. *Fiorini*, 143 Ill. 2d 318, 574 N.E.2d 612. LOLDC was neither the owner-operator of a waste facility nor a dumper, and *Fiorini*'s analysis of third-party action concepts such as contribution and indemnity is not relevant to whether IEPA was entitled to summary judgment against LOLDC for what occurred while Lincoln was using LOLDC's land. *Fiorini*, 143 Ill. 2d 318, 574 N.E.2d 612. Similarly, *Brockman* was an IEPA enforcement action in which a landfill owner-operator brought a third-party complaint for contribution and cleanup costs against his customers and the generators and transporters of allegedly toxic or hazardous waste. *Brockman*, 143 Ill. 2d 351, 574 N.E.2d 626.

¶ 28    We also see no relevance in *A.J. Davinroy* because it is an enforcement action against a contractor who purportedly discharged large quantities of raw sewage into a ditch instead of rerouting it to the treatment plant while repairing or installing portions of a village sewer system in southwestern Illinois. *A.J. Davinroy*, 249 Ill. App. 3d 788, 618 N.E.2d 1282.

¶ 29    The People rely heavily on *Gonzalez*, where a limited liability company and the individual who owned the company were held liable for open dumping of waste, in part because one or both of them contracted to accept open dumping of waste (even giving away a key to the front gate), which resulted in littering, scavenging, open burning, and the depositing of general

construction or demolition debris. *Gonzalez*, 2011 IL App (1st) 093021, ¶ 34, 960 N.E.2d 772. One of the issues was whether the LLC and the individual were "in control of the premises where the pollution occurred." (Internal quotation marks omitted.) *Gonzalez*, 2011 IL App (1st) 093021, ¶¶ 33-34, 960 N.E.2d 772. That is one of the issues here, but we cannot analogize the facility owner-operators in *Gonzalez*, who flouted environmental laws, to the current property owner who did not own or operate a landfill and who entrusted its clean land to a facility operator who expressly "agree[d] to develop and operate the Facility in compliance with all federal, state and local laws and regulations, and current practices and technology, including conforming to [the Act at issue and another environmental statute]."

¶ 30    The People insist these cases are helpful even though they do not repeat "the exact fact pattern," but we see no similarity between the property owner accused in this case and the facility operators in three of the cited cases (*Fiorini*, *Brockman*, and *Gonzalez*) or the polluting contractor in the other case (*A.J. Davinroy*). There is no similarity because LOLDC never operated Lincoln's illegal facility, never discharged raw sewage or otherwise illegally disposed of waste, and consistently required that Lincoln comply with all laws.

¶ 31    The People next cite a decision of the Illinois Pollution Control Board involving three construction companies that engaged in a joint venture with the City of Chicago to install a major sewer at Lawrence Avenue in Chicago, *Environmental Protection Agency v. James McHugh Construction Co.*, Ill. Pollution Control Bd. Op. 71-291, at 4-511 to 4-513 (May 17, 1972). The drilling and digging process released ground water, and the construction crews used municipal water to cool their tunneling equipment. *Id.* When these waters were pumped out of the construction area, they were laden with suspended limestone, and the contractors were required by the joint-venture contract to construct a basin that would allow suspended material to first

settle from the water before it was discharged into the North Branch of the Chicago River. *Id.* An IEPA inspector observed three instances when water was discharged more or less directly into the river. *Id.* at 4-511 to 4-512. Testing showed that the effluent contained prohibited suspended limestone, iron, and lead. *Id.*

¶ 32    When determining whether the City had "allowed" pollution and could be held liable for what its contractors had done, the question was whether the City had been in a position to "exercise control to prevent pollution." *Id.* at 4-513. The board reviewed some of its prior decisions, such as one in which it held a landfill operator responsible for open burning of refuse at his facility near Peoria, Illinois. *Id.* at 4-513 to 4-514. He professed he did not know about the violations, but as the owner of the refuse facility, he was responsible for the pollution, whether he did the burning himself or allowed others to do so. *Id.* at 4-514. The board contrasted that instance with its decision regarding a landfill in Waukegan, Illinois, in which the board held that a land trustee who was not involved in the management of the property itself could not be held responsible for open dumping but that two trucking companies were liable for waste they dumped at the unpermitted site. *Id.*

¶ 33    Guided by this precedent and the statutory language, the board then determined that it would be proper to hold the City of Chicago liable for the dirty water dumped into the Chicago River because the City placed the settlement basin requirement in its joint-venture contract with the contractors, kept an engineer on site to enforce its contractual interests, and was "fully involved" in pollution control planning and implementation on the project. *Id.* at 4-514 to 4-515.

¶ 34    Although the present case involves a property owner and facility owner relationship rather than a joint-venture construction project, the board's analysis is instructive. Furthermore, in enforcement actions involving leased property, the board has not imposed liability on

landlords that were not involved in the tenant's operations. *Illinois Environmental Protection Agency v. Lake County Grading Co.*, Ill. Pollution Control Bd. Op. 81-11, at 3 (May 18, 1984) (lessors were "merely the landowners who lease the land *** and do not have any control over the [tenant's] operations of [a sanitary landfill]"); *People v. Berger*, Ill. Pollution Control Bd. Op. 94-373, at 9 (May 6, 1999) (finding that landowner was not liable for conducting a waste disposal operation because its involvement "is only as an owner [of the property]").

¶ 35    Applying this reasoning and the spirit of the Act, we conclude that it is not proper to hold this landowner liable for violations that a landfill developer-operator allowed to occur on the land between 2002 and 2007, contrary to the landfill operator's express contractual obligation to develop and operate its facility legally and, as discussed below, despite the landowner's pursuit of its contractual rights through arbitration and litigation in order to stop the illegal waste disposal operation.

¶ 36    The People's appellate argument focuses on LOLDC's willingness to let its land be used as a landfill and its failure to ensure that the facility operator either obtain a permit before accepting waste or stop operating as soon as it received an IEPA violation notice. There is, however, nothing inherently wrong with allowing one's property to be used as a landfill, particularly this property, which the record indicates had been previously used by the property owner for a permitted landscape-waste composting facility. Furthermore, there was nothing inherently wrong with contracting with Lincoln's principal, Mr. Einoder, who, at the time of contracting, had only been accused of violations at another location and had not been adjudicated as a violator of environmental laws. In addition, LOLDC did not disregard environmental laws, regulations, or sound practices when it was negotiating and contracting with Lincoln for the lawful use of LOLDC's land. In fact, the seven-page royalty agreement includes repeated

references to the law. In the preliminary recitals of the short document, LOLDC stated its "desire[ ] to effect development and operation *** consistent with [environmental laws, regulations, and practices]," and Lincoln stated its "expertise to engineer, develop, and operate the Facility contemplated." This is followed by additional paragraphs that dictate Lincoln's "COMPLIANCE WITH LAWS" and specifically require it to obtain any necessary "PERMITS." Although there was no disagreement that a small amount of water being discharged from the site required an NPDES permit, there was apparently, however, a strong difference of opinion between IEPA and Lincoln as to whether Lincoln's overall operations were the type that required a permit. The difference of opinion between IEPA and Lincoln as to whether the accumulating material was "waste" was one that Lincoln has been willing to spend 14 years, and considerable effort and resources, to resolve in the circuit and appellate courts. Furthermore, the People tell us that Mr. Einoder relied on similar arguments to defend his facility and landfill operation in Lynwood, Illinois, and that his dispute with IEPA went as far as the Supreme Court and resulted in a guilty plea by Mr. Einoder to criminal charges and the imposition of personal liability on his spouse due to her involvement in the operation. We are confident that this sorry state of affairs, particularly the personal consequences to the Einoders, were not what Mr. Einoder envisioned when he contemplated operating in Lynwood and at the Ford Heights property at issue. We are confident that Mr. Einoder did not anticipate such problems or that LOLDC could have foreseen them when it was negotiating his use of its property and entering into the royalty agreement. The People now look back with 20/20 hindsight and fault LOLDC because it did not do more than contractually require Lincoln to operate legally and it was no more successful than IEPA was in shutting down Lincoln's illegal operations. Under the circumstances presented, we do not share the People's opinion that LOLDC invited a problem to its property and "allowed" Lincoln's open

dumping violations. Furthermore, it cannot be seriously contended that "nothing prevented the LOLDC defendants from seeking a permit" for Lincoln's operation. LOLDC was not in a partnership or joint venture with Lincoln, and LOLDC was incapable of representing Lincoln in the permitting process.

¶ 37    We also reject the contention that LOLDC should have somehow forced Lincoln to stop operating as soon as IEPA sent its first violation notice. The People treat IEPA's violation notices as the equivalent of an administrative order or judicial finding of illegality and breach of Lincoln's contractual obligation to LOLDC. With due respect to the agency's expertise, its issuance of a notice does not have the force of an adjudication. An IEPA notice of violation is merely a notice of potential liability and is "a preliminary step in [IEPA's] investigation of possible violations of the Act." *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 389, 639 N.E.2d 571, 574 (1994). The agency's functions are to issue permits, investigate potential violations, and prosecute alleged violators of the Act. *National Marine*, 159 Ill. 2d at 389, 639 N.E.2d at 574. IEPA has the burden of proving violations of the Act before the Pollution Control Board or the circuit court, and IEPA does not adjudicate matters. *National Marine*, 159 Ill. 2d at 389, 639 N.E.2d at 574. Upon receiving a violation notice, a potentially responsible party "may then undertake the response action requested, may meet and attempt to settle with the Agency, or may choose to ignore the notice entirely." *National Marine*, 159 Ill. 2d at 389, 639 N.E.2d at 574. "Notifying a party that it is subject to an investigation which may potentially lead to the institution of an action against that party does not create a claim capable of judicial resolution." *National Marine*, 159 Ill. 2d at 389, 639 N.E.2d at 574. A violation notice is a "preliminary stage in the administrative process, [and] it is not clear whether the Agency will ever initiate a cost-recovery/enforcement proceeding [before the board

or the circuit court] against [the alleged violator]." *National Marine*, 159 Ill. 2d at 390, 639 N.E.2d at 575. A determination of an actual violation "if it is ever even made, rests in the Board or the circuit court," not in the agency, and certainly not in the agency's mere notification that it is investigating a possible violation. *National Marine*, 159 Ill. 2d at 390, 639 N.E.2d at 575. Thus, the contention that, upon receiving IEPA's violation notice, LOLDC should have forced Lincoln to shut down until it obtained a permit is unpersuasive.

¶ 38    In addition, even IEPA took little apparent interest in following through on its violation notice. IEPA issued its first notice in August 2002 but did not file suit until 2004 and did not move for judicial resolution until 2007. As we noted above, the People have not disputed LOLDC's recollection that the People filed a motion for preliminary injunction in the trial court in 2004 but allowed that motion to "languish for over three years" before deciding to instead move for partial summary judgment in 2007 as to whether the landfill materials were indeed "waste" as that term is used in the Act. Meanwhile, Lincoln's operations continued in full swing, and IEPA was aware that the waste pile was growing in all directions. According to the People's initial complaint on August 6, 2004, when IEPA inspected on August 15, 2002, it documented the fact that Lincoln's waste pile was "300 feet long, 90 feet wide[,] and 8 feet above the surrounding topography" and by October 9, 2002, that the pile was "680 feet long, 315 feet wide[,] and 47 feet higher than the surrounding topography." The complaint describes IEPA's repeated inspections and increasing measurements in 2003 and 2004, including the allegation that IEPA documented that the large pile "appeared to more than double in size" between May 2003 and August 2004. Nonetheless, the waste dumping continued unabated until 2007 when Lincoln lost its argument in the trial court that the material was not "waste" and then agreed to shut down pending its appeal of that summary judgment ruling. In short, IEPA itself failed to

follow through on its violation notice and it apparently spent five years doing little more than inspecting the site between 2002 and 2007. The People now argue that LOLDC should have taken the matter into its own hands between 2002 and 2007 and that LOLDC's failure to do so amounts to ignoring warning signs, condoning continued dumping, and effectively allowing open dumping within the meaning of the Act.

¶ 39    Given that IEPA did not treat the alleged violation as a clear and urgent case, we can hardly fault landowner LOLDC for the actions that it did take. Once IEPA carried through on its investigation and violation notices by filing this suit, LOLDC (1) demanded that the facility operator shut down, (2) joined in IEPA's motion for a preliminary injunction, (3) filed for arbitration in accordance with its contract with Lincoln, and (4) when the arbitration proceedings proved futile because the chosen arbitrator ceased doing business, LOLDC obtained the court's approval to instead escalate to litigation. With the court's leave, LOLDC then filed a counterclaim against Lincoln, seeking Lincoln's remediation of the site, LOLDC's indemnification, and other relief. LOLDC's claim for injunctive relief was denied as moot in 2009 due to the prior shutdown in 2007. However, in 2012, LOLDC prevailed on its claim for indemnification from Lincoln, thus increasing the pressure on Lincoln to address the environmental issues that Lincoln created.

¶ 40    We do not mean to suggest that a landowner will have no liability when it contracts for another party to develop and operate a waste disposal site on the property. However, the facts presented to us do not suggest that LOLDC could have anticipated that Lincoln would develop and operate a facility that would cause environmental problems or that LOLDC had any active or passive responsibility for the violations that Lincoln was causing between 2002 and 2007. We reiterate that when the royalty agreement was being negotiated and signed, the person LOLDC

was contracting with, Mr. Einoder, had only been accused of violations at another site, and he had not been adjudicated as a violator of environmental laws in Lynwood. Furthermore, when deposed on April 4, 2012, Mr. Einoder said that he understood that he had been required by LOLDC's royalty agreement to act in compliance with the laws and to obtain any permits required for his facility; no one ever told him he could ignore any provision in the royalty agreement, no one ever told him to operate without the required permits, and no one ever told him to operate the landfill illegally. In addition to these facts is the fact that in 2011, in preparation for the permanent injunction hearing, the People entered into stipulations that assign fault for the illegal operations to Mr. Einoder and his company, Lincoln, but not to LOLDC. The People and Mr. Einoder and his company, Lincoln, stipulated:

"12. At all times relevant to this lawsuit, John Eindoer, as part of his duties as an officer of Lincoln, Ltd., participated in the on-site operations on a regular basis on the Site.

13. As President of Lincoln, Ltd., John Einoder had the authority to stop any activities conducted by Lincoln, Ltd. or its agents or employees that were in violation of, or contrary to, applicable environmental laws and regulations.

14. John Einoder or Lincoln Ltd. at no time applied for or obtained any waste disposal permit from the Illinois EPA to construct or operate the Lincoln, Ltd. facility.

15. John Einoder took no actions to cease operations at the Site until a waste disposal permit could be obtained from the Illinois EPA.

16. John Einoder, on behalf of Lincoln, Ltd., signed hundreds of recycle/disposal agreements with third parties to receive materials at the Site.

17. Only John Eindoer, on behalf of Lincoln, Ltd., had the authority to sign

recycle/disposal contracts with third parties to receive materials at the Site.

18. John Einoder, on behalf of Lincoln, Ltd., entered into agreements with environmental consultants in connection with the operations at the Site."

¶ 41 The stipulations with Mr. Einoder are in stark contrast to the stipulations the People entered into with LOLDC:

"1.The LOLDC Defendants had no management or maintenance responsibilities in connection with waste disposal operations conducted at the Site, and did not actively or personally participate in the day to day operations of the landfill at the Site.

\*\*\*

3. There is no evidence or allegation that any of the LOLDC Defendants ever signed any recycling and/or disposal contracts with third parties to dispose of their wastes at the Site.

4. There is no evidence or allegation that any of the LOLDC Defendants ever signed any agreements with environmental consultants in connection with waste disposal operations at the Site.

5. [Developer Lincoln, Ltd. agreed to develop and operate in conformance with the law and regulations.]

6. [Developer Lincoln, Ltd. acknowledged responsibility for obtaining any necessary permits.]

\*\*\*

8. At all times relevant to this action, Lincoln, Ltd. operated an unpermitted landfill at the Site."

¶ 42 Thus, in 2011, after all of its repeated site inspections and years of litigation, IEPA

affirmatively stated, in detail, that Lincoln had expressly contracted to set up and run a lawful landfill operation and further stipulated that LOLDC did not manage, maintain, or actively or personally participate in Lincoln's landfill operations.

¶ 43    Moreover, we are not the only court to have rejected the contention that LOLDC should be faulted for Lincoln's landfill operations. In the circuit court, Lincoln argued the indemnification clause could be disregarded as part of a contract that permitted illegal conduct. However, in granting LOLDC's motion to strike Lincoln's affirmative defenses to LOLDC's counterclaim, the circuit court judge then presiding over this case concluded the "royalty agreement *** is not illegal or [void as] against public policy." A different judge subsequently heard and granted summary judgment on LOLDC's indemnification claim.

¶ 44    The People now attribute the illegal operations to LOLDC, even though the royalty agreement between LOLDC and Lincoln did not allow the landowner to have any involvement in operating or shutting down the facility and LOLDC was not capable of controlling the source of pollution between 2002 and 2007. LOLDC could not unilaterally stop Lincoln if it failed to adhere to the contract terms that required it to develop and operate its landfill in accordance with the law and to obtain any necessary permits. The agreement limited LOLDC to mediating or arbitrating any disputes arising from the relationship, and LOLDC did what it could do to stop Lincoln's illegal operations, short of barring Lincoln from the property, which would have been in breach of the royalty agreement. The circuit court reviewed measures that LOLDC took after the People filed the enforcement action and observed, "[h]ardly anything more could have been done to stop Lincoln from operating illegally short of forcibly removing it from the premises, which would have [violated the royalty] agreement." In fact, as soon as LOLDC learned that IEPA was escalating from its preliminary investigation to an enforcement action against Lincoln,

LOLDC demanded that Lincoln cease its operations, and LOLDC joined in the enforcement efforts by arbitrating and litigating. These facts indicate LOLDC did not "allow" Lincoln to operate a landfill illegally and cannot be held liable for Lincoln's unpermitted open dumping on LOLDC's land as alleged in counts X and XV. Accordingly, we affirm, in part, the circuit court's entry of summary judgment.

¶ 45 The People next contend landowner LOLDC is liable under counts X and XV of the amended complaint for "allowing" waste because LOLDC has not removed the accumulated waste or otherwise cleaned up the site that Lincoln used for open dumping. In their reply brief, the People make clear that this argument concerns LOLDC's failure to act "following the December 2007 shutdown" in order to "remedy [Lincoln's] *** illegal disposal" of waste. The People contend that LOLDC's "role in accumulating the waste makes no difference" for purposes of liability, given that allowing the waste to remain after 2007 is allowing the illegal situation to continue. This argument is best addressed in conjunction with the People's argument concerning count XIV of the amended complaint, which is that LOLDC has "abandoned" waste at an unpermitted facility, as that verb is used in section 21(e) of the Act (415 ILCS 5/21(e) (West 2012)), because the landfill materials have remained on LOLDC's property since Lincoln shut down its operations in December 2007. The People contend that regardless of LOLDC's inability to stop Lincoln's operations prior to 2007, that since Lincoln's shutdown by agreed court order in 2007, LOLDC has had the "capacity to control" its premises and remediate the pollution, which it has instead "abandon[ed]" at the site.

¶ 46 The People emphasize that this argument is "a second, independent (although related) line of reasoning" to its other argument, and in their reply brief, the People point out that LOLDC has not provided a response. LOLDC's lack of response is perhaps attributable to the

fact that the argument was downplayed in the People's motion for summary judgment and not specifically addressed in the circuit court order on appeal. The argument, however, became more prominent in the People's motion for reconsideration of the order and thus was preserved for our consideration as to whether summary judgment should have been granted.

¶ 47    Although we have rejected the People's argument that LOLDC allowed open dumping of waste by failing to prevent or shutdown Lincoln's operations, we do find some merit in the contention that LOLDC is now abandoning or storing waste on its unpermitted property by failing to remediate the pollution.

¶ 48    The People are correct that it is illegal to fail to remedy pollution on one's land, even if someone else, even unknown others, created the problem. This principle is illustrated by some of the cases cited above. For instance, in *Gonzalez,* statutory violations occurred not only when the landowners illegally accepted waste as we discussed above but also when the landowners failed to remove waste that predated their ownership. *Gonzalez*, 2011 IL App (1st) 093021, 308 N.E.2d 829. Landowner liability for violating section 21 of the Act, as alleged here, was affirmed in part in *Gonzalez* because the evidence indicated (1) the landowners "were aware of the preexisting fly-dumped waste at the time of the [land] purchase but failed to remove it for over 14 months" and (2) the landowners were in control of the premises where the pollution occurred. *Gonzalez*, 2011 IL App (1st) 093021, ¶¶ 33-37, 960 N.E.2d 772. Similarly, in *Meadowlark Farms*, the statutory offense was attributed to material that had been discarded during the surface mining of coal between 1943 and 1957, which was well before the land changed ownership in 1967 and well before rainwater passing through the leftover material created acid that killed fish in a nearby creek in 1972. *Meadowlark Farms*, 17 Ill. App. 3d at 853-54, 308 N.E.2d at 831. The landowner was not charged with creating the refuse piles or with responsibility for operating the

coal mine that left the refuse piles, but was charged with ownership of the surface rights to the property that was the source of the water pollution problem and with the capability of controlling the pollutional discharge. *Meadowlark Farms*, 17 Ill. App. 3d at 860-61, 308 N.E.2d at 836. The landowner's liability for violating section 12(a) of the Act was affirmed. *Meadowlark Farms*, 17 Ill. App. 3d at 863, 308 N.E.2d at 837. Although this case concerned water pollution, rather than the open dumping, it illustrates that the courts will find liability when a landowner currently has the capability of control over pollution, even when the landowner attributes the problem to someone else.

¶ 49    A clear standard of landowner liability has also been stated by the Illinois Pollution Control Board in proceedings in which landowners attributed violations to others. The property owner in *Rawe* attributed abandoned cars in his ravine to attempts by the prior landowner, his father, to stop soil erosion. *Illinois Environmental Protection Agency v. Rawe*, Ill. Pollution Control Bd. Op. AC 92-5 (Oct. 16, 1992). The board found, however, that a violation of section 21 of the Act can be found for "allowing" litter and that to "allow" includes "present inaction on the part of the landowner to remedy a previous violation." *Id.* at 6. Specifically, the board held that "passive conduct amounts to acquiescence sufficient to find a violation" and that "[p]resent inaction on the part of the landowner to remedy the disposal of waste that was previously placed on the site, constitutes 'allowing' litter in that the owner allows the illegal situation to continue." *Id.*. The board found the son in violation of the Act for allowing litter on his property. *Id.* at 7. The same standard was applied by the board in *Hsueh*, in which the property owner contended he did not dump or allow anyone else to dump lumber, old cars, paint cans, and metal scraps in the tall weeds on a woody hill behind his apartment buildings. *Sangamon County Department of Public Health v. Hsueh*, Ill. Pollution Control Bd. Op. AC 92-79 (July 1, 1993). He said that

some of the items had been there for many years and that he had attempted to clean them up. *Id.* Similarly, it was undisputed in *Shrum* that the landowner had not placed the charred remains of wood pallets and debris from construction or demolition on his property, and that when he discovered the waste, he attempted to clean it up. *Illinois Environmental Protection Agency v. Shrum*, Ill. Pollution Control Bd. Op. AC 05-18 (Mar. 16, 2006). Nonetheless, as it did in *Rawe*, the board ruled in both *Hsueh* and *Shrum* that the current landowner was liable for failing to remedy the previous violation.

¶ 50     Our decision in 2008 in the first interlocutory appeal settled the question of whether the material on the Ford Heights property is unpermitted waste within the meaning of the statute. Under the standards used by the court and the board, as cited above, the question becomes whether, as the owner of the land containing debris illegally dumped by Lincoln's operation, LOLDC is allowing littering in violation of section 21(e) of the Act by its passive conduct or inaction to remedy the disposal of waste presently on its property.

¶ 51     Leading up to that appeal, LOLDC actively pursued remediation of the pollution on its land. For instance, when IEPA indicated in 2004 that its investigation warranted escalating to an enforcement action, LOLDC immediately demanded that Lincoln cease all operations on LOLDC's property. Lincoln, however, ignored that directive, and when LOLDC repeated the demand, Lincoln continued to ignore it. The following month, the People filed a motion for preliminary injunction of Lincoln's operations, and LOLDC joined in the People's motion. The People, however, allowed the motion to languish for over three years, and Lincoln continued its operation. Despite the People's delay in pressing for the injunction, LOLDC still tried to force a shutdown in 2004, by declaring Lincoln to be in default of its contractual obligation to operate within the law and by demanding that Lincoln participate in arbitration. Lincoln, however, not

only continued to operate but also refused to arbitrate. LOLDC then obtained a court order in early 2005 requiring Lincoln to arbitrate pursuant to the terms of the royalty agreement. In the arbitration, LOLDC contended Lincoln's operations were illegal and that it must shut down the business. Lincoln, however, would still not stop permitting dump trucks to deposit waste on LOLDC's property. In 2007, the People finally proceeded on a motion for partial summary judgment as to whether the material Lincoln was accumulating was "waste" within the meaning of the Act. Later that same year, the circuit court granted the People's motion against Lincoln and Mr. Einoder. But even then, Lincoln continued to accept waste. The People next presented a motion for temporary restraining order and for ruling on the motion for preliminary injunction, which had been pending since 2004. Lincoln appealed the "waste" finding in 2007, and finally, when Lincoln could not or would not put up the funds for an appeal bond, Lincoln entered into an agreed shutdown order with LOLDC and the People in December 2007. Meanwhile, although LOLDC had forced Lincoln into arbitration, the proceedings proved fruitless because the arbitration company named in the royalty agreement subsequently ceased doing business. The royalty agreement did not provide for this possibility, and Lincoln and LOLDC were unlikely to agree to another alternative. Even so, LOLDC persisted in its efforts to address the pollution and did so by returning to the circuit court with a request for the court to vacate its order sending LOLDC and Lincoln to arbitration and to grant leave to instead litigate. While LOLDC's motion was pending, in mid-2008, we affirmed the entry of partial summary judgment against Lincoln and Mr. Einoder, concluding that the accumulated debris was "waste" and that "Lincoln's unpermitted waste pile violates the Act." *Lincoln*, 383 Ill. App. 3d at 203, 208, 890 N.E.2d at 979, 983 (answering certified question in the affirmative that "clean construction and demolition debris deposited onto the land *** constitutes 'waste' under the Illinois Environmental

Protection Act and requires a permit in compliance with the Act's waste disposal requirements").

¶ 52    After our ruling, in early 2009, the circuit court granted LOLDC's motion to vacate the arbitration order and for leave to file a counterclaim. LOLDC was ready to proceed with its counterclaim, and it filed the pleading that same day. In its counterclaim, LOLDC sought groundwater monitoring, remediation of the pollution, to be fully indemnified for the unpermitted landfill, and also an accounting and payments due under the royalty agreement, which Lincoln had stopped making when the contracting parties' relationship soured. Lincoln fought LOLDC's counterclaim, and LOLDC wound up performing the groundwater monitoring at its own expense (which showed that there was no contamination from the debris). In addition, in mid-2009, Lincoln filed a motion to dismiss LOLDC's counterclaim. When this motion was heard later in 2009, only LOLDC's claims of breach of contract and indemnity survived, and Lincoln was ordered to answer them. LOLDC wanted Lincoln to remove the waste, but the circuit court dismissed LOLDC's request for injunctive relief as moot based on the fact that the parties had entered into the agreed shutdown order. Next, Lincoln filed an answer to the surviving claims, but it also pled affirmative defenses. LOLDC filed a motion to strike the affirmative defenses, and another year passed before late 2010, when the circuit court struck the affirmative defenses. In this order, the circuit court rejected the contention that Lincoln and LOLDC were equally culpable and expressly ruled that Lincoln had contracted to operate legally. In 2011, the circuit court resolved a disagreement as to whether the 2007 partial summary judgment ruling included a finding of liability against LOLDC for the waste accumulated by Lincoln, and the court ruled that LOLDC's liability had not yet been determined. Several more months passed while the People were seeking reconsideration of this ruling, which was denied. Then, on March 21, 2012, the circuit court granted LOLDC's motion for full

indemnification from Lincoln. In the order, the court reviewed the history and specified that LOLDC "had no role in the operation or development of the landfill in question" and "did not allow Lincoln to operate illegally." The court concluded that Lincoln "is obligated to indemnify LOLDC for the underlying environmental violations and reasonable attorney's fees, costs, and expenses of this litigation."

¶ 53    Subsequent to that indemnification ruling, the People filed the amended complaint now at issue, in which the People, for the first time, separated the allegations against Lincoln from the allegations against LOLDC. Then, between 2012 and 2014, LOLDC and the People prepared and resolved cross-motions for summary judgment as to the amended complaint, and in late 2014, the proceedings finally concluded in the circuit court and this appeal began.

¶ 54    Above, we rejected the People's arguments that LOLDC "allowed" Lincoln to operate illegally and could have done more between 2002 and 2007 to stop the pollution from occurring. The procedural history indicates that during those years, LOLDC was diligent and active in its efforts to prevent the pollution that sits on its land and to force Lincoln to remediate the waste. It is also our opinion, however, that after the first interlocutory appeal concluded in mid-2008, which was eight years ago, Lincoln should have begun remediating the pollution, and the question of its civil liability could have also been addressed by now. We realize that to economize the efforts of the parties and the use of judicial resources, it may have appeared prudent to stay Lincoln's remediation of the property and liability for civil penalties until the courts had also considered LOLDC's involvement in the pollution. Nevertheless, some amount of pollution has been sitting on the Ford Heights land since 2002, which was 14 years ago, and Lincoln's liability for that pollution was adjudicated years ago. The circuit court did not address the remaining question of whether LOLDC has violated the Act by allowing waste to remain on

its property after the site's shutdown in 2007, even though LOLDC did not become an "operator" of a waste facility after the shutdown. LOLDC has not specifically addressed this question either, but it has persuasively argued that it did not allow Lincoln to pollute. We agree with the circuit court that LOLDC was not an operator under the Act and did not become an operator after the shutdown. Furthermore, this case is different from the decisions the parties cited to the circuit court judge and which we summarized above, involving landowners who claimed they should not be held liable because someone else created pollution on their land. The differences are that the polluter, Lincoln, is also before the court, has been ordered to shut down, has been found in violation of the Act, and is liable for the remediation of the pollution. These orders were entered not only because of the People's efforts but also in part because of LOLDC's efforts through arbitration and litigation to force the shutdown and hold Lincoln accountable.

¶ 55    Based upon our review of the record, we conclude that LOLDC has not been passive or inactive in its efforts to remedy the waste since the actual shutdown because of the contractual nature of its royalty agreement with Lincoln and its active participation in this litigation. During most of that time period, LOLDC has made concerted efforts to have Lincoln clean up the pollution. As pointed out above, it first attempted arbitration, and when that failed, it pursued other legal remedies by way of its counterclaim. Significantly, both of these efforts were stymied every step of the way by Lincoln. After a few years LOLDC was granted judgment on that counterclaim. It pursued its appropriate and legal remedies. As a result of the successful judgment on its counterclaim, it has now been fully indemnified by the trial court. We conclude this course of action on LOLDC's part did not amount to its acquiescence of illegal activity. However, at some point, it cannot be said that the continuation of litigation permits an owner of land to indefinitely postpone and thereby allow waste to remain on its property and not be

obligated to remove the waste should another responsible party not do so. Therefore, although we conclude the circuit court properly held LOLDC was not an operator and did not allow the pollution as an operator as such after the shutdown, to the extent it has now been fully indemnified, we conclude that as a landowner LOLDC can no longer claim that it has no responsibility to remedy the pollution on its property. LOLDC must also be held responsible for the waste that remains on its property to this day.

¶ 56    In light of the pertinent authority, particularly the board's application of the Act and rulings entered in this case that include the indemnification order, we reverse the summary judgment in part and hold that LOLDC, as owner of the Ford Heights land, is required to remedy the storage or abandonment of waste on its property by Lincoln in violation of section 21(e) of the Act. 415 ILCS 5/21(e) (West 2002). Mindful of the primary purpose of the Act, which the General Assembly specified is to assure that "adverse effects upon the environment are fully considered and borne by those who cause them" (415 ILCS 5/4/(b) (West 2002)), we direct the circuit court to now (1) order Lincoln to immediately remediate the property and (2) quickly conclude the issue of Lincoln's civil penalties and fines. In addition, if Lincoln fails to remediate the pollution in a timely manner, we direct the circuit court to order LOLDC to take over that task. Ultimately, LOLDC is fully protected by the circuit court's indemnification order in its favor, which was not appealed. The royalty agreement obligates Lincoln to "indemnify, defend and hold Owner [LOLDC] harmless from and against all suits, causes of action, claims, damages, judgments, penalties, demands, injunctions, costs, disbursements or expenses (including reasonable attorney's fees) of any kind which may at any time be imposed upon, incurred by or asserted or awarded against the Owner and arising from or out of the ownership or operation of the Facility by the Developer [Lincoln] or the release of any substances in violation

of any environmental law." We leave any issues regarding the imposition of costs, penalties, and fines against Lincoln and/or LOLDC to the circuit court.

¶ 57    Summarizing, we have affirmed the circuit court's summary ruling as to LOLDC for its conduct or action regarding Lincoln's operations, but we reverse and remand with directions regarding LOLDC's liability as the owner of currently polluted land.

¶ 58    We also find that Mr. Cainkar is not personally liable for LOLDC's violations despite the People's three alternative arguments for subjecting him to judgment. Personal liability can be based on an individual corporate officer's personal involvement or active participation in violations of the Act (*People ex rel. Madigan v. Tang*, 346 Ill. App. 3d 277, 283, 805 N.E.2d 243, 249 (2004)), but the allegations and argument regarding Mr. Cainkar's conduct do not meet this standard. We also reject the sufficiency of the allegations and argument that the LOLDC corporation was merely Mr. Cainkar's alter ego or a business conduit of his governing or dominant personality. *Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551, ¶ 19, 33 N.E.2d 696. The allegations and argument for holding Mr. Cainkar personally liable under the responsible corporate officer doctrine are similarly deficient and unpersuasive. *United States v. Park*, 421 U.S. 658, 673-74 (1975); *United States v. Hong*, 242 F.3d 528, 531 (4th Cir. 2001); *Commissioner, Department of Environmental Management v. RLG, Inc.*, 755 N.E.2d 556, 561-63 (Ind. 2001).

¶ 59    For the reasons discussed above, with respect to LOLDC, we affirm in part and reverse in part the circuit court's summary judgment ruling as to LOLDC, and we affirm the ruling as to Mr. Cainkar. We remand for further proceedings consistent with this opinion.

¶ 60    Affirmed in part, reversed in part, and remanded with directions.

PRESIDING JUSTICE ELLIS, concurring in part and dissenting in part.

¶ 61    I concur with the majority's decision to reverse the grant of summary judgment and to remand this matter to the trial court to order the cleanup of the Ford Heights site. But I concur in the result only. I respectfully dissent from the reasoning and scope of the majority decision. In my view, LOLDC should be held liable for the pollution taking place on its land from the first day the polluting activity began.

¶ 62    As far as my or the parties' research discloses, this is the first reported court decision in Illinois in which a landowner has escaped liability under the Act for pollution taking place on its land. There may be scenarios under which a landowner should be able to do so, but this case is certainly not one of them.

¶ 63    The legislature tells us that the Act "shall be liberally construed so as to effectuate" its purposes. 415 ILCS 5/2(c) (West 2010). We have typically read it in such a fashion. We have held that landowners were properly found liable under the Act for pollution occurring on their land, even when they had nothing whatsoever to do with the polluting act, and even when they had no idea at all that the pollution existed in the first place. See, *e.g.*, *Gonzalez v. Pollution Control Board*, 2011 IL App (1st) 093021, ¶ 34 (owner liable for dumping performed by trespassers); *Perkinson v. Pollution Control Board*, 187 Ill. App. 3d 689, 691 (1989) (owner of swine farm liable for discharge of swine waste via trench even though he "did not cause or authorize the trench and ha[d] no knowledge of who was responsible for it"); *Hindman v Pollution Control Board*, 42 Ill. App. 3d 766, 767, 769 (1976) (landowner was liable for refuse fire started on his property even though neither he nor his employees started fire, and cause was unknown); *Meadowlark Farms, Inc. v. Pollution Control Board*, 17 Ill. App. 3d 851, 853-54, 861 (1974) (landowner liable for refuse pile created between 10 and 24 years before landowner purchased property and about which landowner had no knowledge); *Bath, Inc. v. Pollution*

*Control Board*, 10 Ill. App. 3d 507, 510 (1973) (owner of landfill liable for underground burning even though cause of burning was unknown).

¶ 64    In this case, however, the landowner avoids liability. Why? Not because it was unaware of the acts that caused the pollution; LOLDC was fully aware of what was happening on its property—it had contracted for this very work to be performed and was taking a cut of the profits from it. And not because it sold the property to someone else or bought it after the polluting act had occurred; LOLDC owned this property at all relevant times and still does today.

¶ 65    Instead, the landowner avoids liability under the Act in this case because it brought another company onto the property—Lincoln—under a contract that is a cross between a royalty agreement and a lease, which gave Lincoln the right to perform the work that constituted the polluting act, and most importantly in the eyes of the majority, delegated all responsibility for compliance with the Act to Lincoln. That simple contractual shifting of responsibility from LOLDC to Lincoln is enough, in the majority's view, to allow LOLDC to wipe its hands of the entire affair and pass all legal responsibility off on Lincoln for its damage to the environment. LOLDC is allowed to disclaim any "capacity to control" the work through the strategic drafting of a private contract.

¶ 66    First of all, I disagree that the royalty agreement deprived LOLDC of the capacity to control this portion of Lincoln's operation. Second, and just as importantly, even if it did, I do not believe that a private company should be allowed to avoid a duty to the public at large to protect the environment and keep its property free of pollution simply by virtue of a private contract with another private party. I think that runs contrary to the letter and purpose of the Act. And finally, even if everything else I have said is wrong, I cannot understand why LOLDC continues, to this day, to avoid responsibility for the cleanup of pollution on its property, even

though the party to whom it supposedly delegated authority has been gone for nearly ten years, leaving LOLDC as the sole entity in control of the property during that entire window of time.

¶ 67    First, the royalty agreement between LOLDC and Lincoln did not deprive LOLDC of control over Lincoln's obtaining of all necessary environmental permits. That is not just my interpretation. It is also how the parties to the royalty agreement once interpreted it, on a different occasion during the landfill's operation, when LOLDC used its contractual muscle to compel Lincoln to obtain an environmental permit regarding a different aspect of the operation.

¶ 68    Under section 21 of the Act, a party may be held liable for "allow[ing]" open dumping. 415 ILCS 5/21(a), (p)(1), (p)(7) (West 2010). In order to show that a party has "allowed" open dumping, the State " 'must show that the alleged polluter has the capability of control over the pollution or that the alleged polluter was in control of the premises where the pollution occurred.' " *Gonzalez*, 2011 IL App (1st) 093021, ¶ 33 (quoting *People v. A.J. Davinroy Contractors*, 249 Ill. App. 3d 788, 793 (1993)). This court has held that "[p]roperty owners are responsible for the pollution on their land" unless one of two exceptions applies: (1) the owner of the source of the pollution lacked the capability to control the source of the pollution; or (2) the owner has " 'undertaken extensive precautions to prevent vandalism or other intervening causes.' " *Gonzalez*, 2011 IL App (1st) 093021, ¶ 33 (quoting *Perkinson*, 187 Ill. App. 3d at 695).

¶ 69    In this case, it is undisputed that LOLDC owned the site where the pollution occurred and would be liable under the general rule. But according to the majority, the first exception listed above applies to LOLDC because it lacked the ability to control Lincoln's dumping of the waste without a permit.

¶ 70    The majority's conclusion is based on the notion that "the royalty agreement between LOLDC and Lincoln did not allow the landowner to have any involvement in operating or shutting down the facility." *Supra* ¶ 44. But "involvement" in the operations is not the standard. This court has repeatedly held that, even when a landowner has *no* involvement in illegal dumping, the landowner may still be held liable because of his ability to control his property. See, *e.g.*, *Gonzalez*, 2011 IL App (1st) 093021, ¶ 34 (owner liable for dumping performed by trespassers); *Perkinson*, 187 Ill. App. 3d at 691 (owner of swine farm liable for discharge of swine waste via trench even though he "did not cause or authorize the trench and ha[d] no knowledge of who was responsible for it"); *Bath*, 10 Ill. App. 3d at 510 (owner of landfill liable for illegal burning even though he did not burn the waste); *Meadowlark Farms*, 17 Ill. App. 3d at 853-54, 861 (landowner liable for refuse pile created between 10 and 24 years before landowner purchased property).

¶ 71    The operative question is whether LOLDC had the capacity to control this portion of the operation. *Gonzalez*, 2011 IL App (1st) 093021, ¶ 33; *Perkinson*, 187 Ill. App. 3d at 695. And the royalty agreement proves LOLDC's capacity to control Lincoln's conduct. The contract required Lincoln to obtain all necessary environmental permits, and it gave LOLDC the legal right to compel the enforcement of that contractual obligation. If LOLDC believed that Lincoln was violating the terms of the royalty agreement by failing to obtain a permit, it could demand that Lincoln obtain that permit and demand arbitration over the question if Lincoln refused. The mere fact that LOLDC could not obtain the permit itself, or could not use physical force to compel Lincoln to do so, does not change the fact that it had the legal capacity to compel Lincoln to do so.

¶ 72    Indeed, we have an example of LOLDC's ability to control Lincoln's conduct in the record. In September 2003, after learning that Lincoln had failed to obtain a National Pollutant Discharge and Elimination System (NPDES) permit (a permit relating to wastewater discharge), LOLDC sent Lincoln a letter notifying Lincoln that it had defaulted on its obligation to obtain the necessary permits under the royalty agreement and demanded that it do so immediately. In response, Lincoln obtained the NPDES permit. It is absurd for LOLDC to claim it could not control Lincoln's behavior when it had previously done so. LOLDC's demand to Lincoln was not a friendly suggestion; it was a notice of default that carried with it the legal threat to seek arbitration to enforce a contractual provision if Lincoln did not comply.

¶ 73    At oral argument, LOLDC distinguished its demand for the NPDES permit from Lincoln's obtaining of the waste-dumping permit at issue in this case on the ground that Lincoln *agreed* to get the NPDES permit, but it did not agree to obtain the other permits. But whether Lincoln agreed to do it or refused to do it is irrelevant. In fact, whether LOLDC even demanded that Lincoln do it is irrelevant. The only relevant question is whether LOLDC had the ability—the legal right—to compel Lincoln to do it. And LOLDC unquestionably did, as the plain language of the royalty agreement made clear and as exemplified by the demand for the NPDES permit.

¶ 74    The majority places great emphasis on the notion that LOLDC did what it could to stop Lincoln's illegal operations by pursuing its contractual rights. The majority's recognition of those rights *proves* LOLDC's capacity to control Lincoln. Those steps—however late in the game they occurred and however questionable their sincerity after LOLDC denied that pollution was taking place for nearly two years after being so advised by the State—included the very same steps of pursuing arbitration and seeking injunctive relief against Lincoln. LOLDC, in

other words, exercised its rights under the contract to compel Lincoln to either obtain those permits or stop its work. Whether those legal steps came to a prompt resolution or not is utterly beside the point; LOLDC was not a bystander to the pollution but rather had the legal right to stop it from happening. It had the capacity to control that portion of the operation relating to compliance with the Act.

¶ 75    The majority claims that LOLDC could not unilaterally stop Lincoln from operating if Lincoln "failed to adhere to the contract terms that required it to develop and operate its landfill in accordance with the law and to obtain any necessary permits." *Supra* ¶ 44. If the majority means that LOLDC could not physically prevent Lincoln from operating—that it could not change the locks on the doors, stand armed guards outside, build a brick wall around the facility, or the like—then I agree. But the majority cites no authority, and I have not found any, suggesting that *physical* control of the property is necessary.

¶ 76    And requiring physical control is nonsensical. A landlord is never allowed to resort to physical force if his or her tenant fails to comply with the lease. See 735 ILCS 5/9-101 (West 2002) ("No person shall make an entry into lands or tenements except in cases where entry is allowed by law, and in such cases he or she shall not enter with force, but in a peaceable manner."); *Fortech, L.L.C. v. R.W. Dunteman Co.*, 366 Ill. App. 3d 804, 814 (2006) (Illinois law "prohibits any actual or constructive self-help through force, including changing locks or locking someone out of his land" (internal quotation marks omitted)).

¶ 77    When an entity has the authority to compel a contracting party to do something, it can never "unilaterally" compel them in a physical sense, but that entity can use legal, peaceable means to enforce compliance. So while I might agree that LOLDC lacked the authority to

"unilaterally" stop the work, it had the *legal* authority to stop the work through the appropriate legal means—under the royalty agreement, by initiating arbitration.

¶ 78    I respectfully disagree with the majority's interpretation of section 21. The majority criticizes the People for failing to cite cases that "hold a property owner liable for environmental violations committed by or under the watch of a separate facility operator." *Supra* ¶ 27. But the majority cites no case in which the Illinois Supreme Court or this court has held that a landowner who contracts with another party for the express purpose of operating a landfill on the land lacks control over the operator simply because of the terms of the contract—a contract into which the landowner willingly entered and, in this case, drafted. Instead, the majority relies on vastly distinguishable case law and administrative decisions.

¶ 79    The majority cites *Phillips Petroleum Co. v. Pollution Control Board*, 72 Ill. App. 3d 217 (1979), which is the *only* reported decision that has concluded that a property owner lacked sufficient control to be held liable for allowing pollution. In *Phillips Petroleum*, the court held that the owner of a gas tank car, Phillips Petroleum, was not liable for allowing pollution where it turned possession of the tank car over to a railroad company to transport the tank car from Illinois to Wisconsin, and the train derailed during the trip, resulting in a puncture of the tank car and the release of dangerous gas. *Id.* at 219-21.

¶ 80    There are numerous critical differences between *Phillips Petroleum* and this case. First, and most importantly, *Phillips Petroleum* involved *personal* property, not *real* property. This distinction is important because personal property is movable, while real property is not. Whereas the railroad car's owner *physically delivered* the tank car to the railroad for transportation in *Phillips Petroleum*, literally ceding physical control of the property to the railroad, LOLDC could not move its land and deliver it to Lincoln. Instead, LOLDC knew

precisely where its land was and could have drafted the royalty agreement to allow for inspections or other methods to ensure that Lincoln used the land lawfully. Although LOLDC chose not to do so, that was a risk it elected to take.

¶ 81    Second, *Phillips Petroleum* said nothing about a landowner-operator relationship. The majority's holding in this case is premised on the notion that, as a mere landowner, LOLDC lacked control over the party operating a landfill on its land. But *Phillips Petroleum* does not speak to that issue, as it did not involve real property or a anything resembling the operation in this case.

¶ 82    Finally, nowhere in *Phillips Petroleum* did the court endorse the notion that the terms of any contract between the railroad and Phillips could serve to insulate Phillips from liability to the public. There was no discussion of a contract at all, let alone any indication that the parties could skirt liability by carefully drafting any such contract. Thus, *Phillips Petroleum* does not support the majority's holding that LOLDC could contract away its liability under the Act.

¶ 83    Our precedent that actually deals with landowners has held that landowners with far less capability of controlling pollution than LOLDC may still be held liable under the section 21. For example, in *Gonzalez*, 2011 IL App (1st) 093021, ¶ 34, this court found that a landowner had allowed open dumping even though the waste was left by trespassers.

¶ 84    In *Perkinson*, 187 Ill. App. 3d at 691, 694-95, this court held that the owner of a pig farm was liable for allowing liquid swine waste to discharge into a nearby creek via a trench, even though the landowner did not dig the trench, did not authorize the digging of the trench, and did not know who dug the trench or when it was dug.

¶ 85    In *Hindman*, 42 Ill. App. 3d at 767, 769, this court held that a landowner was liable for a refuse fire started on his property even though neither he nor his employees started the fire, and it was unclear who did.

¶ 86    In *Meadowlark Farms*, 17 Ill. App. 3d at 853-54, 861, the landowner was liable for a refuse pile's pollution of a nearby body of water, even though the refuse pile was created by the previous owner long before the current landowner purchased the property without knowledge of the pollution.

¶ 87    And in *Bath*, 10 Ill. App. 3d at 510, this court held that a landowner was liable for underground burning at a landfill even though no one knew the cause of the burning.

¶ 88    In each of these cases, a totally unknown source caused the pollution. Arguably, the landowners would have had no way to foresee that some unknown person would pollute their land, making the landowners less capable of controlling that unknown person. But that was not the conclusion reached in those cases. Instead, in each case, this court held that these landowners were liable because the pollution occurred on their land because of their capability to take precautions to ensure that their land would not be polluted.

¶ 89    In this case, LOLDC was not victim to wholly unforeseen and unknown polluters. Rather, LOLDC obviously knew that the polluter, Lincoln, would be operating a landfill on LOLDC's land. It was entirely foreseeable that Lincoln would fail to comply with the law. In fact, the royalty agreement shows that LOLDC was fully aware of this possibility, as it included a clause requiring Lincoln to "conform[ ] with the requirements of the *** Act" and a clause whereby LOLDC could demand and enforce such compliance by submitting the issue to an arbitrator.

¶ 90    As the owner of the property, LOLDC was in an excellent position to control Lincoln's operation both at the time it entered into the royalty agreement and when it learned of Lincoln's

failure to adhere to the Act. In fact, LOLDC exercised such control by (1) requiring Lincoln to submit to inspections of its books and records; (2) requiring Lincoln to allow someone from LOLDC to be present to oversee the collection of revenue; and (3) pursuing arbitration and an injunction once the State formally accused Lincoln of operating illegally.

¶ 91 The majority also relies on two decisions of the Illinois Pollution Control Board, *Illinois Environmental Protection Agency v. Lake County Grading Co.*, Ill. Pollution Control Bd. Op. 81-11 (May 18, 1984), and *People v. Berger*, Ill. Pollution Control Bd. Op. 94-373 (May 6, 1999). The majority claims that these decisions show that "the board has not imposed liability on landlords that were not involved in the tenant's operations" (*supra* ¶ 34), but these decisions say nothing of the sort.

¶ 92 *Lake County Grading* was an opinion and order approving a settlement between the IEPA and two corporations that had been operating a landfill. *Lake County Grading Co.*, Ill. Pollution Control Bd. Op. 81-11. The landowners were not even parties in the IEPA's action. *Id.* The majority quotes the following passage from *Lake County Grading*: "Vanderspool and Long are merely the landowners who lease the land to [the] company and do not have any control over the operations of [Lake County Grading Company] of Libertyville." *Id.* at 3. But that quote was simply part of the Board's recitation of the *factual background* of the landfill. *Id.* Vanderspool and Long, the owners of the land on which Lake County Grading operated the landfill, had nothing to do with the IEPA's suit. *Id.* In *Lake County Grading*, the Board said *nothing* about a landowner's liability for his tenant's pollution.

¶ 93 Nor is *Berger*, Ill. Pollution Control Bd. Op. 94-373, relevant to this case, as it involved a landowner's liability under a *different provision* of the Act. An individual, Wayne Berger, operated a landfill for several years then transferred his interest in the property containing the

landfill to a corporation, Berger Waste Management, Inc. (BWM). *Id*. at 2-3. The State charged Berger and BWM with a violation of the Act's *financial assurance requirements*, which required "[t]he operator" of a landfill to maintain a certain level of financial assurance. *Id.* at 8 (quoting 35 Ill. Adm. Code 807.603, amended at 9 Ill. Reg. 18942 (eff. Nov. 25, 1985)). The Board determined that Berger had violated that regulation but found that BWM could not be liable because it simply owned the land. *Berger*, Ill. Pollution Control Bd. Op. 94-373, at 9. BWM did not conduct any of the waste disposal operations or hold any of the permits; Berger alone operated the landfill. *Id.*; see 35 Ill. Adm. Code 807.104, amended at 9 Ill. Reg. 18942 (eff. Nov. 25, 1985) (defining "operator" as "a person who conducts a waste treatment, waste storage or waste disposal operation").

¶ 94    In this case, unlike *Berger*, the People did not have to show that LOLDC was an "operator" of the landfill. Rather, the People charged LOLDC with allowing open dumping under sections 21(a), (p)(1), and (p)(7) of the Act (415 ILCS 5/21(a), (p)(1), (p)(7) (West 2012)), which prohibit any "person" from causing or allowing open dumping. 415 ILCS 5/21 (West 2012). And a " '[p]erson' is any individual, partnership, co-partnership, firm, company, limited liability company, corporation, association, joint stock company, trust, estate, political subdivision, state agency, or any other legal entity, or their legal representative, agent or assigns." 415 ILCS 5/3.315 (West 2012). Unlike *Berger*, where the regulatory provision at issue only applied to the operator of the landfill, the statutory provisions at issue in this case apply more broadly. Thus, *Berger* does not support the majority's conclusion that a landowner cannot be liable for causing or allowing open dumping on his land simply because another entity leases the land and runs the landfill.[2]

---

[2] LOLDC also cites *City of Morris v. Community Landfill Co.*, 2011 IL App (3d) 090847, and

¶ 95    In sum, both the contractual language in the royalty agreement and LOLDC's previous assertion of control over the environmental aspect of Lincoln's work demonstrates that LOLDC had the capacity to control the relevant portion of Lincoln's operations.

¶ 96                                    II.

¶ 97    The second reason I disagree with the majority is that, even if it were correct that LOLDC lacked the capacity to control this portion of Lincoln's work, that can only be due to contractual language drafted by LOLDC in the royalty agreement, and I do not believe that a private landowner should be able to use private contractual language to avoid a duty it owes to the public at large to not pollute on its land.

¶ 98    The majority says that it does "not mean to suggest that a landowner will have no liability when it contracts for another party to develop and operate a waste disposal site on the property." *Supra* ¶ 40. But that is the inescapable result of its holding.

¶ 99    By this precedent, the applicability of a remedial statute, designed to protect the citizens of this State from environmental harms, will rise or fall on the whims of private contract negotiations. Parties are allowed to contractually define their rights and obligations vis-à-vis each other, but they should not be able to divvy up, among themselves, responsibility to the *public* for pollution they create pursuant to that contract. The public was not a party to that

---

*People v. William Charles Real Estate Investment, L.L.C.*, Ill. Pollution Control Bd. Op. 10-108 (Mar. 17, 2011), in support of the notion that the Act does not impose liability on a landlord for its tenant's operations, but those cases do not support LOLDC's argument. *City of Morris*, like *Berger*, involved the Act's financial assurance requirements, which apply only to *operators* of a landfill, not to any person who allows pollution. *City of Morris*, 2011 IL App (3d) 090847, ¶¶ 23-28. And *William Charles Real Estate Investment, L.L.C.*, Ill. Pollution Control Bd. Op. 10-108 (Mar. 17, 2011), involved a landowner's assertion of an "act of God" defense based on the fact that the pollution occurred during a 250- or 500-year storm. There was no alleged act of God in this case.

contract. The public should not be bound by that contract. The Act should not be constrained by that contract.

¶ 100   Even if LOLDC ceded its capacity to control Lincoln through the royalty agreement—which, in my opinion, it did not—LOLDC chose to restrain itself. There is no question that LOLDC knew that Lincoln would be operating a landfill and that Lincoln would have to comply with the Act in doing so: the royalty agreement expressly states that LOLDC agreed to have Lincoln develop and operate a "demolition debris landfill" that "conform[ed] with the requirements of the Illinois Environmental Protection Act." With this knowledge, LOLDC could have negotiated mechanisms by which it could have ensured that Lincoln was operating the landfill in compliance with the Act. Instead, LOLDC chose to submit any disputes over Lincoln's operations to arbitration. LOLDC's choice to insert a mandatory arbitration clause into the royalty agreement should have no effect on its obligation to the public to keep its land free from pollution.

¶ 101   Moreover, LOLDC could have, and did, draft the royalty agreement to ensure that it possessed the power to oversee Lincoln's operations. For example, section 11 of the royalty agreement, labeled, "OVERSIGHT," stated:

> "The Developer [(*i.e.*, Lincoln)] hereby grants the Owner [(*i.e.*, LOLDC)] the right to oversee the receipt of all Gross Revenue. *The Owner shall have the right to have someone present in the office of the Developer at the Facility during operating hours in order to insure that all Gross Revenue is correctly recorded.*" (Emphasis added.)

Similarly, section 8, titled, "BOOKS AND RECORDS," provided:

> "The Developer [(*i.e.*, Lincoln)] shall maintain full and accurate books and records of all operations at the Facility. Developer shall provide a daily printout of shipments and

Gross Revenue to and from the Facility. The Developer shall be responsible for the accounting of all income and expenses incurred in connection with the Facility. *Books and records shall be open to the inspection of the Owner* [(*i.e.*, LOLDC)] *at the Developer's main office during regular business hours provided that 24 hours written notice is given.* On or before the 15th day after each month end the Developer shall deliver to the Owner an income statement \*\*\* for the previous month showing all revenue received by reason of the operation of the Facility." (Emphasis added.)

¶ 102    These provisions show that, when it came to overseeing how much money the landfill was making, LOLDC—which was getting a cut of the operations—was particularly interested in overseeing Lincoln's operations. LOLDC could have similarly reserved the right to have someone present to inspect whether any illegal dumping was being performed at the facility. Simply because LOLDC prioritized overseeing the landfill's revenues over its environmental responsibilities does not mean that LOLDC lacked the capability to control Lincoln. To the contrary, the royalty agreement plainly demonstrates that LOLDC could, and did, exercise control over the operation of the landfill.

¶ 103    The majority makes no mention of these provisions or LOLDC's choice to reserve certain powers of oversight. According to the majority, LOLDC's choices in drafting the royalty agreement absolved it of its responsibility to the public. Though I am sure this was not the majority's intent, the unfortunate upshot of today's opinion is that it provides landowners with a detailed roadmap of how to pollute on their land with impunity: bring in another company to do the work, delegate all responsibility for environmental compliance to that other company, turn a blind eye to what is happening on your property (while taking a healthy cut of the profits), and then throw up your hands when the government comes calling and claim a lack of control over

the operations (except, of course, when it comes to overseeing the revenue coming in, where you can exercise as much control as you wish).

¶ 104   We should not condone this see-no-evil, hear-no-evil approach. It directly contradicts the notion that the Act "shall be liberally construed so as to effectuate" its purposes. 415 ILCS 5/2(c) (West 2010).

¶ 105   It also is inconsistent with the overall statutory framework of the Act. The Act has contemplated the precise situation before us and has provided, *not* that the landowner get a complete pass, but that it be able to sue the entity that directly committed the polluting act and force that entity to share in or completely pay for the removal and clean-up of the pollution. Section 45(d) of the Act (415 ILCS 5/45(d) (West 2010)) provides:

"If the State brings an action under this Act against a *person with an interest in real property upon which the person is alleged to have allowed open dumping or open burning by a third party* in violation of this Act, which action seeks to compel the defendant to remove the waste or otherwise cleanup the site, the defendant may, in the manner provided by law for third-party complaints, *bring in as a third-party defendant a person who with actual knowledge caused or contributed to the illegal open dumping or open burning, or who is or may be liable for all or part of the removal and cleanup costs*. The court may include any of the parties which it determines to have, with actual knowledge, allowed, caused or contributed to the illegal open dumping or open burning in any order that it may issue to compel removal of the waste and cleanup of the site, and *may apportion the removal and cleanup costs among such parties*, as it deems appropriate. However, a person may not seek to recover any fines or civil penalties

imposed upon him under this Act from a third-party defendant in an action brought under this subsection." (Emphases added.)

¶ 106   Section 45(d) is so on point with the facts of this case that it seems like it was written for it. LOLDC, the landowner, has an "interest in [the] real property." *Id*. The State has never claimed that LOLDC, itself, committed the act of waste dumping, but rather that LOLDC "allowed" a "third party"—Lincoln—to do so. *Id*. And there can be no question that Lincoln did so with "actual knowledge" (*id.*); there is no claim that Lincoln accidentally dumped the waste without a permit.

¶ 107   Under this section, a landowner is not without recourse if someone else shares in the blame for the polluting act. And because section 45(d) contemplates that the third party might be required to pay for "all *** of the removal and cleanup costs" (*id*.), the Act presupposes a situation where the third party was entirely culpable and the landowner not at all.

¶ 108   And yet, section 45(d) does not provide that the landowner gets a pass even under that scenario. Nowhere does it suggest that the landowner would be dismissed from the suit. To the contrary, even in the scenario where the third party was entirely to blame for the pollution, and thus required to pay for all of the removal and clean-up costs, section 45(d) nevertheless provides that, while the landowner might be able to pass along the costs of *clean-up* and *removal* to the third party, the landowner "may *not* seek to recover any fines or civil penalties imposed upon him under this Act from a third-party defendant." (Emphasis added.) *Id*.

¶ 109   Why would section 45(d) hold the landowner liable for fines or penalties, even if it had nothing to do with the act of polluting? The only reason could be that it was the intent of the General Assembly that the landowner not be permitted to escape liability under this Act for pollution occurring on its land. Perhaps it could ameliorate its damages by bringing a third-party

claim against the entity or person that actually committed the polluting act—perhaps it could even force that third party to pay for *all* of the cleanup and removal—but it could not escape liability altogether.

¶ 110    Section 45(d) strikes a perfectly reasonable balance between holding a landowner liable for damage to the environment caused by operations on its land, on the one hand, and not holding that landowner *exclusively* responsible, monetarily, for fixing the problem, if someone else was also clearly at fault, on the other hand. Section 45(d) incentivizes landowners not to completely ignore what is happening on their property, even in situations (unlike the one here) where a landowner has literally no idea what is taking place on its land.

¶ 111    The majority opinion in this case upsets that delicate balance, tipping the scales firmly on the side of the landowner, as long as that landowner has the sense to strategically draft a contract that gives it a cut of the profits but no direct responsibility for environmental compliance.

¶ 112    I would add that LOLDC was not the innocent bystander that it claims to be, a characterization that the majority embraces. After receiving IEPA's notice of the illegal dumping, LOLDC did not immediately demand that Lincoln stop its operations and vacate the property. For years, it made no effort to try to stop Lincoln from dumping waste without a permit. Instead, it spent that time lobbying to get the Act changed to exclude clean demolition debris from the definition of "waste," which, had Cainkar been successful, would have absolved LOLDC of liability. And even after LOLDC had notice of the possibility that Lincoln was polluting, LOLDC continued to collect its royalty payments from Lincoln. In his deposition, Clarke admitted that LOLDC did so because it wanted to try to recoup as much as possible from Lincoln, as Lincoln had failed to make numerous royalty payments. LOLDC only demanded that Lincoln stop operating once the State filed a lawsuit.

¶ 113  To be clear: I am not faulting LOLDC for trying to change state law, which it had every right to do. Nor am I faulting LOLDC for not immediately accepting the State's accusation that the landfill operations violated the Act; just because the government says so does not make it so. But it seems awfully convenient that, during that entire window of time, LOLDC did nothing to exercise its contractual right to stop Lincoln from polluting, then suddenly did an about-face the moment that the State went public with its accusation via a lawsuit, the first time that LOLDC would have to face a judge—at which time LOLDC became the innocent, absentee landowner shocked and appalled to discover what was happening, in reality, right under its nose, and with its full concurrence, all along.

¶ 114  I cannot agree with the majority's holding that LOLDC may escape liability under section 21 by its own willful ignorance and choice of contractual language. Not only does the majority's holding run counter to the Act's purposes and our precedent interpreting the Act, it encourages landowners to avoid taking steps to try to prevent their tenants' polluting activities and unnecessarily hamstrings the State's efforts to mitigate the public harm caused by polluters.

¶ 115                                             III.

¶ 116  Finally, even if the existence of the lease immunized LOLDC, and even if that contractual hide-and-seek is permitted under the Act, I cannot understand why the majority allows LOLDC to avoid liability for pollution that has remained on its property long after Lincoln ceased operations and left—a period of time that spans nearly 10 years.

¶ 117  There is no dispute that Lincoln ceased operations in December 2007. Since then, nothing has prevented LOLDC from controlling its own property. Thus, even if I were to accept the notion that Lincoln's presence exempted LOLDC from liability—which I do not—I see no

reason why LOLDC would still not be liable for allowing the pollution currently on the site to persist since 2007.

¶ 118    In this case, count XV of the State's complaint alleged that LOLDC caused or allowed open dumping that resulted in litter under section 21(p) of the Act (415 ILCS 5/21(p)(1) (West 2002)). That provision applies to owners, like LOLDC, who do not remedy the existence of preexisting waste on their land when they have the power to do so.

¶ 119    For example, in *Gonzalez*, 2011 IL App (1st) 093021, ¶ 34, this court upheld liability for a landowner who purchased property with "preexisting fly-dumped waste" on it where the owner had "failed to remove [the waste] for over 14 months" after purchasing the property. The owner in *Gonzalez* was liable even though he did not dump the waste and he had undertaken efforts to clean it up after acquiring the property. *Id.* ¶¶ 14-15. In *Meadowlark Farms*, 17 Ill. App. 3d at 853-54, 861, the landowner was liable for a refuse pile's pollution of a nearby body of water even though the refuse pile was created between 10 and 24 years before the landowner purchased the property, and the landowner did not know of the pollution.

¶ 120    Similarly, the Illinois Pollution Control Board "has clearly and long ago established that a current landowner 'allows' open dumping of waste if they [*sic*] take no action to remove an accumulation of waste on their [*sic*] property even when the current landowner was not the one who originally deposited the waste there." *Illinois Environmental Protection Agency v. Shafer*, Ill. Pollution Control Bd. Op. AC 11-28, at 14 (July 26, 2012); see also *Sangamon County Department of Public Health v. Hsueh*, Ill. Pollution Control Bd. Op. AC 92-79, at 4 (July 1, 1993) ("[T]he Board has previously held that 'allow' includes present inaction on the part of the landowner to remedy a previously caused violation.").

¶ 121   For example, in *Hsueh*, inspectors found debris on the landowner's property, but the owner said "that he did not dump the material or allow anyone else to dump material at the site." *Hsueh*, Ill. Pollution Control Bd. Op. 92-79, at 4. The Board still found the owner to be liable because "[p]resent inaction on the part of the landowner to remedy the disposal of waste that was previously placed on the site[ ] constitutes 'allowing' open dumping in that the owner allows the illegal situation to continue." *Id.* at 4-5. See also *id*. at 4 ("passive conduct amounts to acquiescence sufficient to find a violation of Section 21(a) of the Act.").

¶ 122   Similarly, in *Illinois Environmental Protection Agency v. Goodwin*, Ill. Pollution Control Bd. Op. AC 02-17 (July 11, 2002), the Board found that a landowner was liable for allowing dumping under section 21(p) even though he purchased the property after the waste had already been dumped. In 1998, the owner, while living in Kansas, purchased property in Illinois without inspecting it. *Id.* at 2. When he moved to Illinois, he saw that the land, which was a former lumberyard, was littered with debris. *Id.* Approximately two years after buying the property, he began to clean it up. *Id.* The Pollution Control Board noted that "inaction on the part of the owner to remedy the disposal of waste that was previously placed on the site[ ] constitutes allowing litter in that the owner allows the illegal situation to continue." (Internal quotation marks omitted.) *Id.* at 4.The Board held that the owner was thus liable because he "ha[d] owned and controlled the property [since 1998] and has left the litter that had previously been dumped on the site to remain." *Id.* In so ruling, the Board noted its reliance on two previous Board decisions that similarly ruled that inaction by a landowner to remove waste previously placed on the property constituted "allowing" the pollution. See *id*. (citing *County of Will v. Utilities Unlimited, Inc*., Ill. Pollution Control Bd. Op. AC 97-41, at 5 (July 24, 1997), and *Illinois*

*Environmental Protection Agency v. Rawe*, Ill. Pollution Control Bd. Op. AC 92-5 (Jan. 21, 1993)).

¶ 123   In each of these cases, the owners were liable for failing to take action to clean up the property, even though they did not dump the debris on their land, and even if they had begun efforts to clean it up. In this case, LOLDC has done nothing to clean up the property since December 2007, when their polluting tenant ceased operations and LOLDC regained full control of its property. From that point, until now, it cannot be reasonably disputed that LOLDC has allowed open dumping to continue under section 21(p).

¶ 124   The majority attempts to distinguish *Hsueh* and *Goodwin* because, in those cases, the landowners did not know the source of the pollution, whereas in this case, "the polluter, Lincoln, is also before the court, has been ordered to shut down, has been found in violation of the Act, and is liable for the remediation of the pollution." *Supra* ¶ 54. But the notion that a landowner may escape liability when the polluting party is also involved in the case is flatly refuted by section 45(d) of the Act, which expressly keeps landowners on the hook even when another known party causes the pollution on their land. The fact that Lincoln has been found liable does not change the fact that LOLDC remains liable for the pollution. It may reduce the amount LOLDC eventually has to pay, but that is not the question before us.

¶ 125   The majority also tries to distinguish *Hsueh* and *Goodwin* because, in this case, LOLDC "has not been passive or inactive in its efforts to remedy the waste since the actual shutdown" because it pursued its contractual rights. *Supra* ¶ 55. First of all, that point does not distinguish *Goodwin*—the landowner in that case undertook cleanup efforts. Second, and more importantly, LOLDC *absolutely* remained inactive. The pollution has remained untouched since 2007. It sits there today, even with no contract allegedly constraining LOLDC's cleanup.

¶ 126 I agree with the majority's conclusion that LOLDC should be required to clean up the waste currently sitting on its property. But I disagree with the reasoning the majority employed in reaching that conclusion, or its conclusion of when that liability attached. The majority notes that, because "LOLDC is fully protected by the circuit court's indemnification order" and "has been fully indemnified by the trial court," it should now be required to clean up the property, even though it has escaped liability for all pollution up to this point.

¶ 127 Whether LOLDC has been indemnified is irrelevant. As explained above, section 45(d) provides for indemnification of a landowner when another party actually pollutes the land. But section 45(d) expressly requires that landowners remain liable for pollution occurring on their land, provided that they have the capacity to control their land. Here, there is no question that, since 2007, LOLDC was the only party with the right or ability to control the land. The Act does not hinge liability on who actually caused the pollution.

¶ 128 And the majority's conclusion regarding indemnification is inconsistent. If indemnification is the key to triggering LOLDC's liability, why then does the majority not find that LOLDC is liable from the date the indemnification order was entered, March 21, 2012? Instead, the majority attempts to limit LOLDC's responsibility for cleaning up the property only to future cleanup efforts, if Lincoln itself does not perform the cleanup. It allows LOLDC to escape any liability for allowing pollution from 2007 until the date of this opinion. I have found no authority for the notion that the date of an appellate court opinion should affix a landowner's liability under the Act. Nor do I see any reason to prospectively limit LOLDC's liability. LOLDC's capacity to control its land is the benchmark. More than any other party, LOLDC has had a superior capacity to control its property since 2007.

¶ 129   Ironically, based on the case law and administrative decisions cited above, if a new entity had purchased the landfill in, say, 2008 or 2009, or in any year since Lincoln left and LOLDC was the sole entity with any possessory interest in the land, that new entity would be liable for the pollution, even though it had nothing to do with how the pollution got there, and even if it did not know of the pollution when it purchased the land. But according to the majority, LOLDC, who has had sole control over the land since 2007 and knew the polluting activities had taken place, is not liable for that pollution for any time from 2007 until the date of this opinion.

¶ 130   As I explained above, I believe that LOLDC is liable for all of Lincoln's illegal activities since day one. But certainly, once Lincoln left the property in December 2007, there can be no question that LOLDC was obliged to remediate the damage its tenant had caused. Its failure to do so was a violation of section 21(p).

¶ 131   For all of these reasons, I would reverse the judgment of the circuit court and remand for entry of an order granting summary judgment to the State and against LOLDC, and for any further proceedings necessary.